**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| OTHMAN SALEM ALI BENAMARA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANAS TAREK FARAJ ELTAIRA | ) | |
| | ) | **COMPLAINT FOR EXTRAJUDICIAL** |
| and | ) | **KILLING AND TORTURE** |
| | ) | |
| MIFTAH ABDULLAH MOHAMMED ALHARIS | ) | |
| | ) | JURY TRIAL DEMANDED |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KHALIFA HIFTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs Othman Salem Ali Benamara ("Plaintiff Benamara"), Anas Tarek Faraj Eltaira ("Plaintiff Eltaira"), and Miftah Abdullah Mohammed Alharis ("Plaintiff Alharis") (collectively "Plaintiffs"), by and through their undersigned attorneys, allege as follows:

## I. NATURE OF THE CASE

1.      This is an action to recover compensatory and punitive damages for the extrajudicial killing and torture of three Libyans by Defendant Khalifa Hifter ("Hifter"), an American citizen, whose actions are in violation of domestic and international law. In 2014, Defendant Khalifa Hifter ("Hifter") traveled to Libya, declared himself the leader of the Libyan National Army ("LNA"), and attempted to overthrow Libya's internationally recognized

government.

2.　　As acting leader of the LNA, Hifter exercised complete command authority over the LNA and external groups who aided and conspired with the LNA. Under Hifter's command, the LNA engaged in a campaign of war crimes, torture, and extrajudicial killing with the aim of overthrowing Libya's internationally recognized Government of National Accord ("GNA").

3.　　On January 4, 2020, a group of around fifty young unarmed cadets were attacked while marching at a military college in Tripoli, the capital of Libya.[1] As the cadets stopped to turn their procession to the left, a missile slammed into the center of the crowd and exploded. Twenty-six of the cadets perished. Three of the twenty-six decedents, decedent Muthafir Othman Salim Bin Iemarah, decedent Taha Tarik Faraj Eltara, and decedent Abdullah Miftah Abdullah Alharis, were the family members of the above named Plaintiffs. The airstrike that killed them was launched under Hifter's authority.

4.　　Defendant Hifter is personally liable for, or exercised command responsibility over, or conspired with, or aided and abetted, the ordering and launching of this airstrike. Defendant Hifter is liable under domestic and international law for the injuries, pain, suffering, and death suffered by the victims of this unlawful extrajudicial killing and the loss suffered by their family members. Three of those relatives bring suit today.

## II. JURISDICTION

5.　　This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1350. This case arises under Acts of Congress and the Treaties of the United States.

6.　　This Court has personal jurisdiction over Defendant Hifter consistent with Due Process and Virginia's long-arm statute because Defendant Hifter has engaged in lobbying

---

[1] "UAE implicated in lethal drone strike in Libya," BBC, August 28, 2020, at *https://www.bbc.com/news/world-africa-53917791* (accessed September 14, 2022).

2

activity within the forum and transacted business in Virginia.

## III. VENUE

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3). Defendant Hifter currently resides in Libya, and the events and omissions that are the subject of this action arose in Libya.

## IV. PARTIES

### *Plaintiffs*

8.      Plaintiff Benamara is a Libyan citizen and the father of decedent Muthafir Othman Salim Bin Iemarah ("Decedent Iemarah"). Decedent Iemarah, a 19-year-old male, had been a cadet at the military college for about five days before being killed when the military college was struck by the missile launched under Hifter's authority.

9.      Plaintiff Eltaira is a Libyan citizen and the brother of decedent Taha Tarik Faraj Eltara ("Decedent Eltara"). Decedent Eltara, a 26-year-old male, had been a cadet at the military college for nearly two and half months before being killed when the military college was struck by the missile launched under Hifter's authority.

10.     Plaintiff Alharis is a Libyan citizen and the father of decedent Abdullah Miftah Abdullah Alharis ("Decedent Alharis"). Decedent Alharis, an 18-year-old male, had been a cadet at the military college for about twenty days before being killed when the military college was struck by the missile launched under Hifter's authority.

### *Defendant*

11.     Defendant Hifter is an individual person who is a dual citizen of Libya and the United States and a resident of the Commonwealth of Virginia.

12.    Defendant Hifter maintains at least one residence in Virginia, which upon information and belief, includes a residential condominium in Falls Church, Virginia, an eighty-five (85) acre estate located in Keysville, Virginia, and a single-family home in Vienna, Virginia.

13.    Defendant Hifter does not have head of state immunity or foreign official immunity, nor does he have any other statutory or common law immunity or privilege. Hifter has extensively litigated and lost on these issues. *See* Proposed Findings of Fact and Recommendations, *Elzagally v. Hifter*, 1:19-cv-853 (E.D.V.A. June 10, 2022) (Dkt. No 149). The U.S. Department of State has declined to file a statement of interest in recent civil cases against Hifter during both the Trump and Biden Administrations. *See* Notice by the United States of America, *Elzagally*, (January 4, 2021) (Dkt. No 46) and Notice by the United States of America, *Elzagally*, (May 14, 2021) (Dkt. No 62).

## V. FACTUAL ALLEGATIONS

### Governance in Libya

14.    From 1969 to 2011, Libya was under the de-facto control of Colonel Muammar Gaddafi ("Gaddafi"), commander in chief of the armed forces and leader of Libya's governing body.

15.    In early 2011, as a wave of mass protests swept across the Middle East and North Africa labeled the "Arab Spring", a protest movement emerged in Libya demanding democracy, respect for human rights, and an end to state and institutional corruption. Gaddafi's regime brutally repressed the popular protests, eventually using lethal force against demonstrators, crystallizing the political opposition before turning into rebellion.

16.    From February to October of 2011, an anti-Gaddafi revolution swept across Libya as civilians took up arms, militia brigades organized to overthrow Gaddafi, and revolutionary

4

armed groups aided by the international community engaged in an armed struggle with forces loyal to Gaddafi.[2]  Gaddafi's last strongholds fell in October 2011, leading to the revolution and the end of the civil war.  On October 20, 2011 Gaddafi was killed in Sirte, Libya, the last hold-out city for Gaddafi supporters.[3]

17.      On July 7, 2012, Libyans took part in an election to pick 200 representatives for the new legislative authority, the General National Congress ("GNC"), in the country's first successful democratic election in more than 40 years, followed by the rapid transfer of power from the ad hoc National Transitional Council ("NTC") to the duly elected GNC.[4]

18.      In the June 25, 2014 parliamentary elections, the House of Representatives ("HoR") was established as Libya's legislative authority, replacing the GNC, with a mandate to govern until a constitution could be written.[5] The outcome of the June 2014 election for a replacement of the GNC was contested by GNC holdouts, and clashes broke out between those loyal to the HoR, including Hifter's forces, and groups loyal to the outgoing GNC.[6] The HoR relocated to Tobruk, Libya where the HoR then formed a new rival government. This split the Libyan government in two: one governing in Tripoli and one in Tobruk.

19.      On November 6, 2014, the HoR was declared invalid by the Tripoli-based Supreme Court, leaving Libya with no parliament or government able to claim national

---

[2] "Gaddafi: Death of a Dictator," Human Rights Watch, October 16, 2012, at
*https://www.hrw.org/report/2012/10/16/death-dictator/bloody-vengeance-sirte* (accessed September 14, 2022).
[3] Mary Beth Sheridan, "Moammar Gaddafi killed in rebel custody as last loyalist holdout in Libya falls," The Washington Post, October 20, 2011, at https://www.washingtonpost.com/world/middle_east/gaddafis-home-town-overrun-conflicting-reports-on-his-fate/2011/10/20/gIQAMwTB0L_story.html (accessed September 14, 2022).
[4] "Final Report: General National Congress Elections in Libya," The Carter Center, July 7, 2012, at
*https://www.cartercenter.org/resources/pdfs/news/peace_publications/election_reports/libya-070712-final-rpt.pdf* (accessed September 14, 2022).
[5] Nicola Missaglia, "Chaos in Libya: A Background," Istituto per gli Studi di Politica Internazionale (ISPI), February 2, 2017, at *https://www.ispionline.it/it/pubblicazione/chaos-libya-background-17108* (accessed September 14, 2022).
[6] Christopher M. Blanchard, "Libya: Transition and U.S. Policy," Congressional Research Service, April 20, 2016, at *https://apps.dtic.mil/sti/pdfs/AD1013588.pdf* (accessed September 14, 2022).

legitimacy.[7]

20.     On December 17, 2015, following 18 months of United Nations ("UN")-led

negotiations, representatives from the two competing governing institutions – the HoR and the

GNC – signed the Libyan Political Agreement ("LPA") with the intention of reconciling the HoR

and GNA within a single administration and ending the political gridlock and armed fighting that

had started in 2014.[8] The LPA established a nine-member Presidency Council ("PC") – the body

tasked with forming a unity government, the Government of National Accord ("GNA"), and that

functions as head of state and supreme commander of the armed forces – while making the HoR

a primary legislature and GNC members would form a secondary consultative body called the

State Council.[9] The interim GNA was formed with the intent of holding new elections within two

years. The GNA was internationally recognized as Libya's sole legitimate government, including

by the United States and the UN.

21.     In 2016, the HoR withheld its endorsement of the GNA and in August, it voted

overwhelmingly to reject a GNA cabinet proposed by the PC.[10].

22.     At the end of 2016, Libya had three competing governments: the Tripoli-based

UN- and internationally-backed PC; the GNC's successor, the National Salvation Government

("NSG"), also based in Tripoli; and the interim government associated with the HoR in eastern

Libya, respectively.[11]

---

[7] Joanna Apap, "Political developments in Libya and prospects of stability," European Parliamentary Research Service, 2017, at
*https://www.europarl.europa.eu/RegData/etudes/BRIE/2017/603959/EPRS_BRI(2017)603959_EN.pdf* (accessed September 14, 2022).

[8] "Libyan Political Agreement - As signed on 17 December 2015," United Nations Support Mission in Libya (UNSMIL), 2015, at *https://unsmil.unmissions.org/sites/default/files/Libyan%20Political%20Agreement%20-%20ENG%20.pdf* (accessed September 14, 2022).

[9] "Libya: Freedom in the World 2017 Country Report," Freedom House, 2017, at
*https://freedomhouse.org/country/libya/freedom-world/2017* (accessed September 14, 2022).

[10] Ayman al-Warfalli, "Libya's eastern parliament votes against U.N.-backed government in Tripoli," Reuters, August 22, 2016, at *https://www.reuters.com/article/us-libya-security-un-idUSKCN10X1DY* (accessed September 14, 2022).

23.     In 2017, as various armed groups continued to engage in active fighting, none of the country's feuding political institutions constituted an effective national government, and all were dependent for their security on fragile alliances with autonomous armed groups.[12] The UN backed the Tripoli-based GNA, not the rival Interim Government based in the east.[13]

24.     On May 29, 2018, French President Emmanuel Macron held a conference in Paris with rival Libyan figures who reached an agreement to hold parliamentary and presidential elections by December 10, 2018.[14] Ultimately the efforts to organize elections in 2018 faltered, which led to the UN's proposal to hold elections at the end of 2019.[15]

25.     In early 2019, the United Nations Support Mission in Libya ("UNSMIL") was working toward a national conference meant to end Libya's political divisions. But two weeks before the conference was to begin, Defendant Hifter launched an offensive aimed on the capital of Tripoli where the UN-backed GNA was based.[16]

26.     In October 2020, the UN brokered a cease-fire between the Libyan Army of the GNA and the LNA.[17]

27.     In November 2020, UNSMIL facilitated the first round of the Libyan Political Dialogue Forum ("LPDF"), a 74-member delegation comprised of representatives from across

---

[11] Mary Fitzgerald and Mattia Toaldo, "A quick guide to Libya's main players," European Council on Foreign Relations, May 19, 2016, at *https://ecfr.eu/special/mapping_libya_conflict/#cap1* (accessed September 14, 2022).

[12] "Libya: Freedom in the World 2018 Country Report," Freedom House, 2018, at *https://freedomhouse.org/country/libya/freedom-world/2018* (accessed September 14, 2022).

[13] "World Report 2018: Libya," Human Rights Watch, 2018, at *https://www.hrw.org/world-report/2018/country-chapters/libya* (accessed September 14, 2022).

[14] "Libyan factions commit to Dec. 10 elections at Paris talks," France24, May 29, 2018, at *https://www.france24.com/en/20180529-libya-factions-commit-december-10-elections-paris-talks-seraj-haftar* (accessed September 14, 2022).

[15] "Libya: Freedom in the World 2019 Country Report," Freedom House, 2019, at *https://freedomhouse.org/country/libya/freedom-world/2019* (accessed September 14, 2022).

[16] "Libya: Freedom in the World 2020 Country Report," Freedom House, 2020, at *https://freedomhouse.org/country/libya/freedom-world/2020* (accessed September 14, 2022).

[17] "Agreement for a Complete and Permanent Ceasefire in Libya," UNSMIL, October 23, 2020, at *https://unsmil.unmissions.org/sites/default/files/ceasefire_agreement_between_libyan_parties_english.pdf* (accessed September 14, 2022).

Libya, that voted on electoral lists consisting of a prime minister and a separate 3-member Presidential Council.

28.     In February 2021, the LPDF selected an interim Government of National Unity (GNU) tasked with overseeing the presidential and parliamentary elections that had been set for December 2021. The LPDF also selected interim Executive Authority members: Mohamed Al-Menfi was selected as President-designate of the PC; Abdul Hamid Dbeibah was selected as interim prime minister until national elections could be held.[18]

29.     In March 2021, the HoR voted in favor of installing the new interim GNU to replace the GNA. A peaceful transition of power took place from the GNU to GNA shortly after the HoR's vote of approval.

30.     In December 2021, it was announced that the December 24, 2021 elections would be postponed.[19] After the planned elections' indefinite delay, the HoR declared that the mandates of the GNU and interim Prime Minister Dbeibah had expired.[20]

31.     In February 2022, the HoR appointed former Interior Minister Fathi Bashagha as the new prime minister.[21] Soon thereafter, the UN said it continued to back Dbeibah.[22]

32.     On March 1, the HoR held a vote of confidence in the appointment of a new

---

[18] "S/2021/451 - Report of the Secretary-General," United Nations Security Council, May 11, 2021, at *https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2021_451_e.pdf* (accessed September 14, 2022).

[19] "Libyan elections postponed, new date expected within 30 days," United Nations, December 23, 2021, at *https://news.un.org/en/story/2021/12/1108732* (accessed September 14, 2022).

[20] Human Rights Council, "A/HRC/49/4 - Report of the Independent Fact-Finding Mission on Libya," United Nations Office of the High Commissioner for Human Rights (OHCHR), March 23, 2022, at *https://www.ohchr.org/sites/default/files/2022-03/A_HRC_49_4_AUV.pdf* (accessed September 14, 2022).

[21] Vivian Yee and Mohammed Abdusamee, "Libya Slides Deeper Into Chaos as Parliament Picks New Government," The New York Times, February 10, 2022, at *https://www.nytimes.com/2022/02/10/world/middleeast/libya-tripoli-parliament-election.html* (accessed September 14, 2022).

[22] "UN backs Libya's interim PM despite lawmakers' challenge," Deutsche Welle (DW), February 10, 2022, at *https://www.dw.com/en/un-backs-libyas-interim-pm-despite-lawmakers-challenge/a-60729255* (accessed September 14, 2022).

government led by Bashagha, known as the Government of National Stability.[23]

*Defendant Hifter's Military Occupation of Libya*

33.     In February 2014, Hifter, a former member of Libya's military under Gaddafi before defecting to the United States in the late 1980's, began his seizure of power in eastern Libya with an appearance on television calling for the unilateral dissolution of the temporary GNC.

34.     Following this address, Hifter ordered forces loyal to him in eastern Libya to initiate "Operation Dignity", an armed offensive intended to take control of Benghazi. During this attempted coup, these forces commanded by Hifter embarked on an internationally documented campaign of detention, torture, and extrajudicial killing, with the ultimate aim of clearing eastern Libya of rival political and military groups.

35.     On March 2, 2015, following Hifter's offensive, the HoR appointed Hifter as commander-in-chief of Libya's military forces, the Libyan National Army.

36.     Soon after taking command of the LNA, video evidence shows that Hifter posted another video message to his forces in September 2015 ordering his forces to show "no mercy" and to take no prisoners.

37.     In 2016, the eastern-based HoR, having effectively split from the internationally recognized-GNC, elevated Hifter's status from lieutenant general to Field Marshal.

38.     Defendant Hifter continued his military offensives under the color of authority of the HoR, which had now effectively split the LNA from Libya's internationally recognized government. Throughout this time, Hifter's army continued a campaign of war crimes.

39.     In one particularly heinous case, forces associated with Hifter directed a series of

[23] Human Rights Council, "A/HRC/49/4 - Report of the Independent Fact-Finding Mission on Libya," OHCHR, March 23, 2022, at *https://www.ohchr.org/sites/default/files/2022-03/A_HRC_49_4_AUV.pdf* (accessed September 14, 2022).

gruesome executions and corpse desecration, some of which they recorded and published.[24] Thirty-three prisoners were tortured and killed, which led to International Criminal Court arrest warrants against Hifter's lieutenant in 2017.[25] Instead of disciplining or turning over the lieutenant, Hifter promoted him to the rank of lieutenant colonel in July 2019.[26]

40.     On April 4, 2019, in an audio recording released on the Facebook page of the LNA's media office, Hifter officially ordered his forces to advance on Tripoli in a "victorious march" to "shake the lands under the feet of the unjust bunch".[27] Hifter warned, "We are coming Tripoli, we are coming."  On that day, the LNA launched a deadly offensive on the capital of Tripoli controlled by the UN-backed government; the assault lasted until June 4, 2020. During the Hifter-ordered offensive, the LNA hit non-military targets—including civilians, residential neighborhoods, medical facilities, and healthcare personnel—with disregard to human life based on alleged claims that they were "terrorist targets".

41.     Defendant Hifter continues to oppose the internationally-recognized Libyan government based in Tripoli.  Hifter is believed to have received support from the governments of Russia and Egypt, and the Russian government has provided Hifter with extensive military support and billions of dollars in financial support.[28]

---

[24] "Situation in Libya: In the Case of the Prosecutor v. Mahmoud Mustafa Busayf al-Werfalli," International Criminal Court, July 4, 2018, at *https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2018_03552.PDF* (accessed September 14, 2022).

[25] "Case Information Sheet: The Prosecutor v. Mahmoud Mustafa Busyf Al-Werfalli," International Criminal Court, updated June 2022, at *https://www.icc-cpi.int/sites/default/files/2022-09/al-werfalliEng.pdf* (accessed September 14, 2022).

[26] Mohamed Sabry Emam Muhammed, "Libya's Haftar promotes officer wanted for war crimes," Anadolu Agency, July 8, 2019, at *https://www.aa.com.tr/en/africa/libyas-haftar-promotes-officer-wanted-for-war-crimes/1526036* (accessed September 14, 2022.

[27] " القائد العام المشير خليفة حفتر يوجه خطابا لكل وحدات الجيش الليبي المرابطين في المنطقة الغربية," مكتب الاعلام - القيادة العامة للقوات المسلحة الليبية, April 4, 2019, at *https://youtu.be/GhCVi38o7bA* (accessed September 14, 2022). القائد العام المشير خليفة حفتر يوجه خطابا لكل وحدات الجيش الليبي المرابطين في المنطقة الغربية

[28] "East Africa Counterterrorism Operation, North and West Africa Counterterrorism Operation, July 1, 2020 - September 30, 2020," U.S. Department of Defense, 2020, at *https://media.defense.gov/2020/Nov/25/2002541626/-1/-*

*Defendant Hifter's Command Responsibility*

42.     As the commander of the LNA, Defendant Hifter has a duty under both domestic law and international law to ensure the protection of civilians, to prevent violations of international law by the LNA, and to ensure all persons under his command are trained in, comply with, and are punished under the laws of warfare. This law includes the prohibition of torture and extrajudicial killing.

43.     Defendant Hifter has failed or refused to take all necessary measures to investigate and prevent such abuses, and he has failed to punish personnel under his command for committing such abuses. The acts of torture and extrajudicial killing inflicted upon the Plaintiffs and the Decedents were part of a pattern and practice of systematic or widespread human rights violations against the civilian population. At all relevant times, Defendant Hifter intentionally directed, knew, or reasonably should have known that his targets were not legitimate military targets and that his forces engaged in a pattern and practice of gross human rights abuses.

*Absence of Legal Remedies in Libya*

44.     Plaintiffs do not have the ability to seek a legal remedy or appropriate civil relief in Libya.

45.     As reported by the U.S. State Department, "[t]he judicial system did not have the

---

1/1/LEAD%20IG%20EAST%20AFRICA%20AND%20NORTH%20AND%20WEST%20AFRICA%20COUNTERTE RRORISM%20OPERATIONS.PDF (accessed September 14, 2022); Declan Walsh, "Waves of Russian and Emirati Flights Fuel Libyan War, U.N. Finds," The New York Times, September 3, 2020, at *https://www.nytimes.com/2020/09/03/world/middleeast/libya-russia-emirates-mercenaries.html* (accessed September 14, 2022); "Russia deploys military fighter aircraft to Libya," U.S. Africa Command, May 26, 2020, at *https://www.africom.mil/pressrelease/32887/russia-deploys-military-fighter-aircraft-to-l* (accessed September 14, 2022); Jonathan M. Winer, "Seized Russian-printed dinars highlight an opportunity to reform Libya's civil war economy," Middle East Institute, November 7, 2019, at *https://www.mei.edu/publications/seized-russian-printed-dinars-highlight-opportunity-reform-libyas-civil-war-economy* (accessed September 14, 2022); Malik Traina, "Fake Libyan dinars, printed in Russia, fund Haftar's military," Al Jazeera, July 13, 2020, at *https://www.aljazeera.com/videos/2020/7/13/fake-libyan-dinars-printed-in-russia-fund-haftars-military* (accessed September 13, 2022).

capacity to provide citizens with access to civil remedies for human rights abuses" and [l]ack of security and intimidation by armed groups challenged the ability of authorities to enforce judgements."[29]

46.     Libyan domestic courts, affected by armed conflict and political changes, are barely functional, with procedures hampered by grave due process violations, including forced confessions, ill- treatment, and lack of access to lawyers. In some areas, including south Libya, the criminal justice system has collapsed. Lawyers, judges and prosecutors are also prime targets of militias.

### LNA Official Statements and Reactions to Atrocities

47.     Defendant Hifter has repeatedly used rhetoric of "cleansing" Libya from Islamists, especially in Benghazi.

48.     In June 2014, in an interview with the Al-Arabiya TV channel, Defendant Hifter declared that "all terrorists who have entered Libya should leave it or they will be buried in it."

49.     In a video on YouTube posted on October 10, 2015, Defendant Hifter delivered a speech to LNA fighters in which he can be heard saying "Never mind consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story."

50.     Other LNA officials have made similar statements regarding prisoners. In another video from August 2016, Beleed Al Sheikhy, identified as a spokesperson for Defendant Hifter, said with regard to fighting in Ganfouda "whoever is above 14 of age will never get out alive."

51.     In August 2017, members of the LNA admitted that their commander, Defendant Hifter, had ordered them to kill the captives and to show no mercy, and that they committed summary execution to cause horror. "We were killing them captives in public and we published

---

[29] "Libya 2021 Human Rights Report," U.S. Department of State, Bureau of Democracy, Human Rights and Labor, 2021, pp. 13-14, at *https://www.state.gov/wp-content/uploads/2022/03/313615_LIBYA-2021-HUMAN-RIGHTS-REPORT.pdf* (accessed September 14, 2022).

12

their killing videos to the public," a militiaman boasted in the statement.

52. On January 4, 2020, an unlawful airstrike was launched under Defendant Hifter's authority against the Tripoli Military College. Plaintiffs' unarmed family members, students at that college, were killed in the airstrike. Defendant Hifter is personally liable for, or exercised command responsibility over, or conspired with, or aided and abetted, the ordering and launching of this airstrike.

## VI. CAUSE OF ACTION

### COUNT ONE

53. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

54. The Torture Victim Protection Act ("TVPA") provides a civil cause of action for the victims of torture and extrajudicial killing against any individual who commits those acts under "the actual or apparent authority, or color of law, of any foreign nation." Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note.

55. The TVPA defines extrajudicial killing that is unlawful under international law and not authorized by the judgment of a regularly constituted court.

56. The TVPA defines torture as acts directed against individuals in the offender's control that inflict severe physical or mental pain and suffering for the purpose of punishment or intimidation of the victim or third parties.

57. The killing of decedents was not authorized by any court judgment.

58. The killing of decedents violated international law, including the Third Geneva Convention.

59. The killing of decedents was extrajudicial killing as defined by the TVPA.

13

60.     The severe pain and suffering inflicted upon decedents before their deaths was torture as defined by the TVPA.

61.     At all relevant times, Defendant Hifter acted under actual or apparent authority, or color of law. He was appointed commander of the LNA by the HoR before it broke away from Libya's internationally recognized government, and he has received the assistance of foreign nations, including Russia. Further, Hifter has attempted to conduct diplomacy as the leader of the LNA, including meeting with world leaders.

62.     Plaintiffs are unable to obtain an adequate remedy in Libya given the ongoing hostilities and dysfunctional judicial system. Any attempt to obtain a remedy there would be futile and create a dire risk of reprisal given Hifter's ongoing activities in Libya.

63.     Defendant Hifter is personally liable for, or exercised command responsibility over, or conspired with, or aided and abetted, the ordering and launching of the airstrike that killed the decedents.

64.     As a result of the extrajudicial killings and torture of their family members, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

65.     Defendant Hifter's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## VII. JURY TRIAL DEMANDED

66.     Plaintiffs demand a jury trial on all issues.


WHEREFORE, Plaintiff pray that this court:

1.  Enter Judgment against the Defendant on all counts.

2.  Award compensatory damages in an amount to be proven at trial, but for each plaintiff

14

not less than $10,000,000.00;

3. Award punitive damages in an amount to be proven at trial, but for each plaintiff not less than $10,000,000.00.

4. Award reasonable attorneys' fees and costs of suit; and

5. Award such further relief as this Court deems appropriate, just, and equitable.

Date: September 15, 2022

Ashraf W. Nubani, Esq.
*Local Counsel*
Virginia Bar #43595
Awn Point Law
6811 Brisbane St.
Springfield, VA 22152
(703) 658-5151
awn@awnpointlaw.com

Miya Griggs, Esq.
*Pending Pro Hace Vice*
GA Bar #140365
691 John Wesley Dobbs
(404) 550-8288
miya@libyanamericanalliance.org

*Attorneys for Plaintiffs*